IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

HORN V. SHELL-HORN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

RYAN B. HORN, APPELLEE,

V.

MELINDA SHELL-HORN, NOW KNOWN AS MELINDA SHELL, APPELLANT.

Filed October 17, 2017.    No. A-17-009.

Appeal from the District Court for Douglas County: HORACIO J. WHEELOCK, Judge. Affirmed.

Angela Lennon, of Koenig & Dunne, P.C., L.L.O., for appellant.

Anthony W. Liakos, of Govier, Katskee, Suing & Maxell, P.C., L.L.O., for appellee.

MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

Melinda Shell-Horn appeals from the decision of the district court for Douglas County modifying custody of one of the parties' two children to joint physical custody. We affirm.

BACKGROUND

Melinda and Ryan B. Horn were married in 2002 and have two children, Truman (born in 2002) and Eleanor (born in 2005). The divorce decree was filed in March 2013. Pursuant to the divorce decree and the parenting plan prepared by the court, and relevant to this appeal, the parties were awarded joint legal custody of the children, with physical custody awarded to Melinda. Ryan was awarded regular parenting time which followed a two-week schedule:

Week one: Dad will have parenting time on Monday beginning at 3:00 p.m. and concluding on Tuesday at 8:00 p.m., and continue Thursday afternoon at 3:00 p.m. and ending at 7:00 p.m. with one of the children on a rotating basis.

- 1 -

Week two: Dad will have parenting time on Tuesday beginning at 3:00 p.m. and concluding on Wednesday at 8:00 p.m. and shall continue on Friday beginning at 3:00 p.m. and concluding at [sic] Monday at 8:00 a.m.

In addition, Dad will have parenting time with each child individually, on a rotating basis, during Week Two beginning Monday at 3:00 p.m. and concluding on Tuesday at 8:00 a.m.

The court also set forth a holiday parenting time schedule. Pursuant to a subsequent order filed in May 2013, the parties were given a "right of first refusal," and had the "option but not the duty" to parent the children when the possessory parent was not available.

In April 2016, Melinda filed an application to modify the decree alleging there had been a material change in circumstances. Relevant to this appeal, Melinda alleged the original parenting plan schedule was no longer appropriate because Ryan's new employment required him to be away from Omaha, Nebraska (where the parties lived), on a regular basis. She therefore sought a revision of the parenting plan.

In his answer and "counter complaint," Ryan alleged there had been a material change in circumstances justifying modification of the decree and asked the court to award the parties joint physical custody of the two minor children "with an equal time sharing schedule of alternating weeks." Ryan did not specifically set forth the alleged material change in circumstances.

Trial took place on September 30, 2016. Because the only issue on appeal relates to a change in physical custody, we summarize only the testimony relevant to that issue.

Melinda testified that pursuant to the March 2013 decree, she has primary physical custody of Truman, 13 years old, and Eleanor, 11. She explained that under the decree, Ryan has parenting time every other weekend, "and then after Ryan's weekend he has them Monday nights and then Tuesday evenings, and then he's supposed to have them a Thursday evening. Then my weekend's after that. Then he has them Monday night, Tuesday night, Wednesday evening." She then clarified that "he takes one child every other Monday and I keep one child every other Monday."

Ryan testified that one or two years prior to the modification trial, he and Melinda informally modified the parenting schedule in the decree to eliminate the afternoon only parenting time (according to the decree, this would be the Thursday from 3 to 7 p.m. during week 1), and instead do an extra overnight one-on-one every two weeks. He offered their modified schedule into evidence (exhibit 28), and it was received without objection. According to exhibit 28, their parenting schedule is as follows:

Week 1
Dad  Mon 3 pm - Tues 8 pm
Mom  Tues 8 pm - Thurs 3 pm
Dad  Thurs 3 pm - Fri 8 am - 1 child
Mom  Thurs 3 pm - Fri 8 am - 1 child
Mom  Fri 3 pm - Mon . . . 3 pm
Week 2
Dad  Mon 3 pm - Tues 8 am - 1 child
Mom  Mon 3 pm - Tues 8 am - 1 child
Dad  Tues 8 pm - Wed 3 pm

Mom     Wed 3 pm - Fri 3 pm
Dad      Fri 3 pm - Mon 8 am

He said they had been following the modification, but "when it comes to nights where it's Eleanor's turn for that one[-]on[-]one, Melinda often denies it." However, Truman is "pretty forceful" about getting his one-on-one overnight with Ryan.

Melinda testified about both parties' work schedules. She is a registered nurse at Children's Hospital and works a "part-time flex-up" schedule of 32 to 40 hours per week. Her schedule allows her to work around both children's schedules and Truman's doctors' appointments. For nearly two years, Ryan has worked in public relations for a company based out of Washington, D.C., which requires erratic and extensive travel. As a result of his travel for work, Ryan has had to cut his parenting time short on multiple occasions. When Ryan misses parenting time, Melinda keeps the children because she "[doesn't] want someone else taking care of [her] children." Her "flex-up" work schedule allows her to do this, but she has to regularly cut back on or increase hours in order to accommodate Ryan's schedule.

Ryan testified he works for Sandler-Innocenzi, which has a home office in Washington, D.C. Travel is a regular part of his job, but it is "fairly predictable." In a normal month he travels 25 to 30-pecent of the business days; 80 to 90-percent of his travel is to the company's Washington D.C. office, where he travels to one week of every month (Monday morning to Friday evening), and those trips are booked three to six weeks in advance. Additionally, "[t]here [were] probably four or five trips this year where we had a chance to pitch business in other cities, and . . . those did come up on fairly short notice." The parties' "crazy parenting plan" is not only difficult and unpredictable for the children, but also is "not ideal" for Ryan's travel schedule. And when Ryan has had to go out of town for travel, Melinda has "without fail refused to trade parenting days" with him.

Melinda offered exhibit 16 into evidence, showing the various dates in 2016 she claims Ryan missed parenting time or appointments; the exhibit was received without objection. However, Ryan testified exhibit 16 was not accurate, and gave some examples of dates he was with the children when Melinda claimed he was not; he also offered photographic evidence and screenshots of text messages to support his testimony, which were received without objection.

Melinda also testified about Truman's health condition and his care needs. Truman was born with a "chromosomal deletion, called 22q," and "with that comes a lot of variations similar to a child with [D]own syndrome." He has epilepsy related to his condition, and also has "a very weak airway which causes it to collapse." He wears a "CPAP" (continuous positive airway pressure) to hold his airway open at night. Truman "doesn't produce enough growth hormones, and he gets severe abdominal and head migraines. He has some learning disabilities and behavioral inconsistencies . . . so he's behaviorally behind" and has had a tutor since the first grade. Additionally, his condition causes him to be very impulsive, and he needs someone to watch him. Truman has a lower immune system and requires weekly "Hizentra infusions" (which Melinda described as "basically somebody else's B cells") to prevent him from getting sick and having seizures. The actual infusion takes 90 minutes, but the entire process takes 2 to 3 hours (medications 30 minutes prior to infusion, and hydrating before and after infusion). Melinda attended training so Truman could receive his infusions at home beginning in February 2016 (prior

to this, Truman had been receiving monthly infusions in the hospital). Ryan did not attend the training; he testified he was not aware there was a training session, but said he would be willing to be trained. Melinda also gives Truman his growth hormone injections five days a week.

Ryan testified he visits with Truman's doctors "as much as possible" but there has been an ongoing struggle in terms of being informed of appointments. "I'll give Melinda great credit for her tenacity in helping Truman, but she has been unwilling to inform me on a regular basis of what's going on or hear my opinions on their -- on their care." While Ryan is aware of most of Truman's medications, he is not aware of all of the medications because Melinda will not always tell Ryan, and will avoid the subject. (On cross-examination, when asked if he was aware of any legal bar preventing him from discussing medical issues with Truman's medical providers, Ryan said he was aware of none. However, he did state that a psychiatrist was not willing to tell him what medication was prescribed for Truman.) To his knowledge, Ryan has never failed to give Truman any required medication. However, Ryan stated Truman is 13 years old, and while Ryan will make sure Truman puts on his CPAP at bedtime, he will not repeatedly check on Truman throughout the night to make sure he kept it on.

According to Melinda, Eleanor does not have any medical or physical conditions other than "just a few issues with coping with the divorce." Both Truman and Eleanor do well in school and get along with other children. Both are involved in extracurricular activities: Eleanor is a swimmer, and Truman plays baseball and is in band and chess club.

Melinda thinks a change in physical custody is "a very bad idea" because "[c]hildren need to know where they're sleeping every night." There has already been some disruption because of Ryan's travel schedule and the children ask, "Do we get to go to Dad's?" Melinda has established a routine with the children at her home, making sure both children brush their teeth and shower, and Truman wears his CPAP. She stated children their ages (11 and 13) often do not want to follow a routine and it "requires some insistence that only a mother can give." She does not believe joint physical custody, as requested by Ryan, would be appropriate. For the "well-being of both" children, Melinda requested physical custody remain with her and she "[doesn't] know how Truman's medical needs can be taken care of if it's not that way." Her proposal to the court (exhibit 20), was for Ryan to get parenting time "2 evenings per week after school until 8:00 P.M. (unless extracurricular activities are scheduled)"; Friday after school until Saturday night at 8 p.m. "when [Ryan] is traveling and gone during the week"; and some additional holidays. Furthermore, she proposed that Ryan get one overnight if a school holiday occurs during the week.

On cross-examination, Melinda stated she does not want Ryan to have overnight parenting time during the school week "because of his travel schedule." She said,

> Children need a consistent home and bed to sleep in. Both children have voiced that they sleep better in their beds at my house, and Truman will wear his CPAP machine at my house, and that sets him up to have a better day. I live right next to the school. They get more sleep time, and so it works out better for everyone because I cannot plan around Ryan's travel schedule where one week he's in town, and then the next week he's not.

When asked if it would be better for the children to have an alternating weekly schedule, where Ryan only traveled during the week that she had the children, Melinda said, "No, because he works in PR and is in a service industry, and I don't know about and he doesn't know about his travel

- 4 -

until he gets clients and clients need them, and so it's last-minute travel, so it would be unfair to the children." She continued, "they would think they're going to be with their dad, and they would be with me one week, and then it would end up being two weeks with me, and then he would think that he would need them for two weeks, and they wouldn't know where they were going."

Melinda agreed that Ryan is a good father "[w]hen he's in town," and the time he spends with them is quality time. When asked if the children have ever told her they would like to spend more time with Ryan, Melinda responded, "Only when he's traveling, and when he tempts them with going to football games and going out of town and going to the movies." Counsel followed up by asking, "So they do want to spend more time with him?" And Melinda responded, "They do like to spend time with their father."

Ryan testified that Melinda is a "wonderful mother 85 percent of the time, but she has some emotional challenges with discipline with Truman and Eleanor both at times." He claimed both children are getting to the age where they want to start making their own decisions and spending more time with their father. Ryan wanted the court to "stop the parenting plan that no one can keep track of," and proposed a new parenting plan (exhibit 12), wherein the parties would be awarded joint physical custody on an alternating weekly schedule. Ryan stated this would allow more predictability for the children and would also allow him to schedule his work travel during Melinda's parenting time.

At the beginning of the modification trial, the court sustained Ryan's motion, over Melinda's objection, to allow the children to testify in camera. However, the court stated it wanted to hear from the parents first to determine whether the children's testimony would be necessary. After the parents' testimony and discussion with both counsel, the court decided it did not need to question the children. However, the parties stipulated that if asked, Truman would state he would like to spend more time with Ryan. There was no mention of what Eleanor's testimony may have revealed.

In its order filed on October 7, 2016, and relevant to this appeal, the district court found both parents had proven a material change of circumstances regarding the physical custody of Eleanor and the parenting plan for both children, but the court did not specify what constituted the material change in circumstances. The court determined both parents were fit and proper persons to be awarded the custody and care of the children, and concluded it was in the children's best interests for the parties to continue to share joint legal custody. However, the court determined it was in Eleanor's best interests that the parents share joint physical custody on a weekly alternating schedule, with exchanges to occur at 8 a.m. on Mondays. As for Truman, the court stated his "health issues combined with his need for structure and [Ryan's] travel schedule have led the Court to conclude that [Melinda] shall be awarded primary physical custody of Truman." Ryan was awarded a parenting time schedule for Truman as follows:

a. Alternating weekends from Friday after school (or at 3:00 p.m. if school is not in session that day) until Monday at the commencement of school (or at 8:00 a.m. if school is not in session that day);

b. During the school year: Every Thursday from after school (or at 3:00 p.m. if school is not in session that day) until Friday at the commencement of school (or at 8:00 a.m. if school is not in session that day);

c. During the school year: Every Monday from after school (or at 3:00 p.m. if school is not in session that day) until 8:00 p.m.;

d. During the summer: Joint physical custody with three days with the father and four days with the mother each week, the specific days to be determined between the parties. In the event the parties cannot agree on the specific days of the week, the Court orders that the parties shall have alternating Saturdays and Sundays beginning at 8:00 a.m. on Saturday morning and ending at 8:00 p.m. on Sunday; the father shall have Wednesday at 5:00 p.m. through Saturday at 8:00 a.m. and the mother shall have Sunday at 8:00 p.m. through Wednesday at 5:00 p.m.

The court ordered that Truman's weekend with Ryan should coincide with the weekend Eleanor is with Ryan. Again, each party was given the right of "first refusal" should the other parent be unavailable during his or her scheduled parenting time. And if a parent travels during his or her parenting time, there will not be any makeup time.

Both parties filed motions for new trial. Ryan alleged "newly discovered evidence" (related to an incident and Melinda's behaviors in the days following trial), and Melinda alleged that Ryan failed to prove a material change in circumstances justifying the custody modification for Eleanor. Both motions for new trial were ultimately denied. However, the district court's December 7, 2016, "order regarding motion for new trial" did set forth specific findings regarding the material change in circumstances. The court found that both Ryan and Melinda had proven a material change of circumstances regarding Eleanor's physical custody. It recalled Ryan's testimony that both children had reached an age where they wanted to start making their own decisions and spend more time with Ryan. And it recalled Melinda's affirmative response when asked if the children ever told her they would like to spend more time with Ryan. The court noted Ryan's testimony that Melinda is a wonderful mother 85-percent of the time, but had some emotional challenges with discipline with both Truman and Eleanor at times. The court "had the opportunity to observe the emotional stress that Melinda was under in order to make the old parenting schedule work and at the same time take care of Truman's very serious health condition." The court "saw that Melinda was experiencing some troubles with the current parenting time schedule and that a more balanced schedule would be in the best interests of the children, as well as the parties." It noted that even Melinda was requesting a modified parenting time schedule, and when asked her reasoning for requesting that primary physical custody of the children remain with her, she cited only Truman's medical needs, giving no explanation of how that pertained to Eleanor. And "[i]t was crystal clear to the Court from Melinda's demeanor and testimony that the current parenting plan and custody arrangement was not working. Between working, rearing the two children, and taking care of Truman[,] Melinda was simply overworked and too stressed out to maintain the status quo by herself." The court "still finds" that it is in the best interests of Eleanor that the parents share joint physical custody on a weekly alternating schedule.

Melinda now appeals.

ASSIGNMENT OF ERROR

Melinda assigns the district court erred in modifying the custodial arrangement of the parties' minor child, Eleanor, to joint physical custody.

## STANDARD OF REVIEW

An appellate court reviews child custody determinations de novo on the record, but the trial court's decision will normally be upheld absent an abuse of discretion. *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015). An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

Parenting time determinations are also matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016).

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

## ANALYSIS

Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Heistand v. Heistand*, 267 Neb. 300, 673 N.W.2d 541 (2004). First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. Next, the party seeking modification must prove that changing the child's custody is in the child's best interests. *State on behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015). A material change in circumstances means the occurrence of something which, had it been known at the time of the initial decree, would have persuaded the court to decree differently. See *Heistand v. Heistand, supra*.

Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides that in determining custody and parenting arrangements:

> [T]he court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :
>
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
>
> (c) The general health, welfare, and social behavior of the minor child;
>
> (d) Credible evidence of abuse inflicted on any family or household member . . . ; and
>
> (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. . . .

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents;

the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb, supra.*

*Material Change in Circumstances.*

Initially we note that only Eleanor's physical custody is at issue on appeal and our analysis is limited accordingly.

Melinda argues "there was no evidence presented regarding a material change of circumstances, and thus a modification of physical custody was not warranted." Brief for appellant at 13. More particularly, she argues "there has not been a material change of circumstances with regard to [Ryan's] work and travel schedule" because "[h]is employment has not changed" and "[h]is travel schedule has not changed." *Id* at 16. This is contrary to her own assertion in her complaint to modify in which she sets forth as one of the material changes in circumstances justifying modification: "Both parties now have different employment."

Further, both Melinda and Ryan testified the current parenting plan authored by the court was not working, particularly in light of the travel required by Ryan's *new job* which he *obtained after the 2013 decree*. Ryan's travel schedule caused him to miss some scheduled parenting time with the children. Melinda would then take on more parenting time with the children, because she did not want others to watch her children. Melinda's proposed solution was for her to maintain physical custody of the children, and reduce Ryan's parenting time. Ryan's proposed solution was for the court to award joint physical custody of the parties' children on an alternating weekly schedule, which would allow more predictability for the children and allow him to plan his work travel during weeks when he did not have parenting time.

Melinda also argues there was "no material change in circumstances regarding Eleanor's wishes or preferences." Brief for appellant at 18. We recognize that at the end of trial the parties stipulated that if asked, Truman would state he would like to spend more time with Ryan, but there was no mention of what Eleanor's testimony would have revealed. However, Ryan testified the "children" wanted to spend more time with their father. And Melinda testified the children do like to spend time with Ryan. Furthermore, when asked if the "children" have ever told her they would like to spend more time with Ryan, Melinda responded, "Only when he's traveling, and when he tempts them with going to football games and going out of town and going to the movies." Despite the caveat Melinda placed on her answer, there is evidence from both parties the "children," which would include Eleanor, would like to spend more time with their father.

It is evident from the court's October and December 2016 orders that, among other factors, it took into account Ryan's travel schedule and the parties' testimony about the "children's" (including Eleanor's) wishes when finding a material change in circumstances regarding the physical custody of Eleanor. After our de novo review of the record, we conclude the district court did not abuse its discretion in finding there had been a material change in circumstances.

*Best Interests.*

Melinda and Ryan presented conflicting testimony regarding whether a change in custody would be in Eleanor's best interests. In contested custody cases, where material issues of fact are in great dispute, the standard of review and the amount of deference granted to the trial judge, who

heard and observed the witnesses testify, are often dispositive of whether the trial court's determination is affirmed or reversed on appeal. *Floerchinger v. Floerchinger*, 24 Neb. App. 120, 883 N.W.2d 419 (2016). The trial court in this case had an opportunity to observe the testimony of both parties. The court acknowledged that "Ryan [and] Melinda are two exceptional parents who put their children first."

In addition to Ryan's travel schedule and the wishes of the "children" (which would include Eleanor), the district court had an opportunity to consider other best interests factors, including Eleanor's general health, welfare, and social behavior; the respective environments offered by each parent; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child.

Melinda argues that although she testified to some difficulties dealing with Truman's health issues, "there was absolutely no evidence presented that Truman's health issues were distracting from the relationship between Eleanor and [Melinda], or that she has failed to meet Eleanor's needs." Brief for appellant at 22. Ryan's response was that the testimony demonstrated the prior parenting time schedule was not working and the children had indicated a desire to spend more time with him. He also points out that the court had the opportunity to observe Melinda's demeanor at trial, which prompted a finding that she was under emotional stress.

Melinda further argues that at trial, "When asked 'what would you like [the judge] to do in making his decision . . .' , [Ryan's] exact response started with the phrase 'I'd like to change the parenting plan', and ended with, 'that would be my suggestion for the parenting plan'"; therefore, "Ryan was not asking for a change in physical custody." Reply brief for appellant at 10. However, Melinda's argument is not supported by the record. Ryan specifically requested an award of joint physical custody in his "Counter Complaint." In addition to the testimony set forth previously, Ryan also testified he would like the court to "stop the parenting plan that no one can keep track of," and he proposed a new parenting plan (exhibit 12), wherein the parties would be awarded joint physical custody on an alternating weekly schedule.

The district court found, "it is clear that . . . Melinda was experiencing some troubles with the current parenting time schedule and that a more balanced schedule would be in the best interests of the children, as well as the parties." And the "Court had the opportunity to observe the emotional stress that Melinda was under in order to make the old parenting schedule work and at the same time take care of Truman's very serious health condition." It found "no reason why Melinda should have to do the majority of Eleanor's rearing by herself, and be the primary caretaker for Truman." Further, "[i]t was crystal clear to the Court from Melinda's demeanor and testimony that the current plan and custody arrangement was not working. Between working, rearing the two children, and taking care of Truman[,] Melinda was simply overworked and too stressed out to maintain the status quo by herself." We give great deference to the trial judge, who heard and observed the witnesses testify. *Floerchinger v. Floerchinger, supra*. Upon our de novo review, we cannot say the district court abused its discretion when it awarded joint physical custody of Eleanor to the parties.

## CONCLUSION

For the reasons stated above, we affirm the district court's decision to award the parties joint physical custody of Eleanor.

AFFIRMED.